IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Leslie Boyd,<br><br>        Plaintiff,<br><br>    vs.<br><br>City of Philadelphia, Curran-Fromhold Correctional Facility, Corizon Health, Inc., and MHM Services, Inc.,<br><br>        Defendants. | CIVIL DIVISION<br><br>2:17-cv-03195-CFK<br><br>Code: |

## Joint Defense Stipulated Statement of Material Facts[1]

### I.  Background

1. Plaintiff was transferred from PICC to CFCF on December 31, 2015.  (Exhibit A, at ¶9).

2. MHM Services, Inc. is not, and was not in 2016, contracted with the City of Philadelphia to provide mental health services to inmates at CFCF.  To the contrary, those services were provided by MHM Correctional Services, Inc., an entity which is not a party to this lawsuit.  (Exhibit B, at ¶2).

3. MHM Correctional Services, Inc. was contracted with the City of Philadelphia to provide only mental health care services to inmates incarcerated within CFCF. (Exhibit B, at ¶3).

4. Mental health care services did not in 2016, or at any other relevant time, encompass providing treatment for physical ailments, complaints of pain or any other physical symptoms.  (Exhibit B, at ¶4).

5. MHM Correctional Services, Inc. was not in 2016, or at any other relevant time, responsible for providing services to inmates complaining of or demonstrating signs of cervical and lumbar spinal cord compression, herniation and stenosis, spinal injury, bowel and bladder incontinence, backing up of bodily excretions into kidneys causing kidney failure, urinary tract infections, cauda equina syndrome, slurred speech, chronic and acute

---

[1] This Joint Defense Stipulated Statement of Material Facts has been stipulated to by all Defendants.  Attempts were made to obtained Plaintiff's stipulation to the facts.  Plaintiff's counsel has not, however, provided a response to Defense Counsel before filing.

back and neck pain, infection, sepsis, dizziness, loss of consciousness, vertigo or failing and losing balance, etc. (Exhibit B, at ¶5).

6. MHM Correctional Services, Inc. was not responsible for responding to requests for medical attention unrelated to mental health concerns, as medical services were provided by Corizon. (Exhibit B, at ¶6).

7. MHM Correctional Services, Inc. was not responsible for providing back or neck braces, durable medical equipment such as a walker, wheelchair, grab bars and does not perform surgeries or medical procedures. (Exhibit B, at ¶7).

8. During the period of January 1, 2016 through March 31, 2016, PPS contracted with Corizon Health, Inc. ("Corizon") for the provision of general medical services to inmates, including inmates at CFCF. (Exhibit A, at ¶4).

9. As part of its contractual duties, Corizon providers were responsible for reviewing inmate sick calls and scheduling inmate appointments with the appropriate Corizon providers as necessary. (Exhibit A, at ¶5).

10. As a further part of its contractual duties, Corizon providers were responsible for determining what course of treatment, if any, to provide to an inmate. (Exhibit A, at ¶6).

## II.     **Plaintiff's Pre-Incarceration History**

11. Prior to his arrival at CFCF, Plaintiff had a history of back issues. (Exhibit C, at 17:10-24).

12. Additionally, Plaintiff had a history of high blood pressure and diabetes, as well as mental health issues including bipolar disorder. (Exhibit C, at 83:14-18).

13. Plaintiff also reports suffering from depression. (Exhibit C, at 83:19-22; 85:3-5).

14. Plaintiff further reports hearing voices "all the time." (Exhibit C, at 116:15-22).

15. Plaintiff retired and began receiving disability around the year 1986 due to his mental health condition. (Exhibit C, at 13:11-22).

16. Plaintiff was not employed at the time he was incarcerated in 2016, and it had been more than 10 years since he last worked. (Exhibit C, at 70:14-24).

### III. Plaintiff's Course at CFCF

17. Prior to his arrival at CFCF, Plaintiff did not inform anyone of his back issues because at that time he was not experiencing back issues. (Exhibit C, at 20:17-21:5).

18. As of his arrival at CFCF on January 1, 2016, Plaintiff did not have back pain or mobility issues. (Exhibit C, at 21:6-10).

19. Upon arriving at CFCF, Plaintiff did not ask for any accommodations for his back issues, including a cane or wheelchair, because he "was doing okay." (Exhibit C, at 21:21-22:7; see also, Exhibit D, at pp. 17-20).

20. During an intake assessment on January 1, 2016, a nurse noted that Plaintiff had a medical history including a herniated disc for which he was taking Percocet and Tylenol #3, and Bipolar disorder for which he had taken Lithium. (Exhibit D, at pp. 17-20).

21. Plaintiff was provided with a lower bunk at intake. (Exhibit D, at p. 17; Exhibit C, at 43:20-44:3).

22. Plaintiff subsequently fell at least twice during his period of incarceration at CFCF. (Exhibit C, at 22:15-19, 30:12-15).

23. Plaintiff did not request any accommodations, including a cane, prior to his first fall. (Exhibit C, at 22:20-23:23:13).

24. Plaintiff was seen by a medical provider at CFCF on January 4, 2016 and complained of low back pain stemming from a motor vehicle accident roughly 10 years before. (Exhibit D, at p. 58). The notes indicated that Plaintiff limped with discomfort upon walking. (Exhibit D, at p. 58).

25. Plaintiff was provided with a warm compress, naproxen, directed to increase his hydration and scheduled to meet with a provider for further evaluation. (Exhibit D, at p. 58).

26. Plaintiff does not recall when he first requested a cane, but was repeatedly told for some period of time that there was no cane available. (Exhibit C, at 34:20-24). He was ultimately provided with a cane but does not recall when he received it. (Exhibit C, at 35:4-9).

27. Records indicate that on January 5, 2016 Plaintiff was seen by medical for chest pain, then complained of headache and asked for medications, then reported that he was prone to falls and needed a cane. (Exhibit D, at pp. 70-72).

28. Plaintiff was provided a cane that same day and he signed a receipt of medical equipment/appliance form confirming the same. (Exhibit D, at p. 67).

29. Plaintiff was seen on January 6, 2016 by a physician's assistant for a follow-up on his back pain. (Exhibit D, at p. 75). Notes indicate he was ordered to continue Naproxen through January 15, 2016. (Exhibit D, at p. 75).

30. On the same date, Plaintiff was seen by a psychiatrist regarding his mental health needs and indicated that he did not want any changes to his medications as he had been stable on Lithium and Benadryl in the past. (Exhibit D, at p. 76).

31. During that visit, Plaintiff reported no suicidal or homicidal ideations and had no psychotic symptoms. Lithium was ordered for Plaintiff on the same date. (Exhibit D, at pp. 76-80).

32. Plaintiff was seen by medical on January 10, 2016 reporting he felt dizzy and weak. (Exhibit D, at pp. 92-94). Plaintiff denied back pain, lightheadedness and numbness. (Exhibit D, at pp. 92-94).

33. Medical records indicate that Plaintiff was found sitting on his bottom bunk and stated that he had not gone out for his accu check. (Exhibit D, at pp. 92-94). He was assisted to a stretcher and brought to medical. (Exhibit D, at pp. 92-94). Plaintiff was provided with his morning medicine and educated on having his accu checks done and blood pressure checked. (Exhibit D, at pp. 92-94).

34. Plaintiff was seen by mental health on that same date (Exhibit D, at pp. 95-97). Although he was initially frustrated and expressed that he had a conflict with medical earlier that

day, he was cooperative by the end of the contact after the mental health provider educated him about procedures regarding housing placements, social services and the role of the mental health department. (Exhibit D, at pp. 95-97). The provider also suggested coping skills to help him adjust to incarceration and provided education on how to access mental health. (Exhibit D, at pp. 95-97).

35. On January 15, 2016, Plaintiff underwent a routine general medical examination at which time his labs were drawn and assessed. (Exhibit D, at p. 103).

36. In response to abnormal labs and self-reported diabetes, a diagnostic profile was ordered for Plaintiff on January 17, 2016. (Exhibit D, at p. 108).

37. Plaintiff was again seen by a medical provider on January 19, 2016 in response to a sick call requesting to have his blood pressure checked and accu check completed. (Exhibit D, at pp. 112-113). Records from this visit indicate that Plaintiff was using a cane to ambulate. (Exhibit D, at pp. 112-113).

38. During that visit, Plaintiff confirmed he had not taken his blood pressure or diabetes medication and was educated on taking all prescribed medications. (Exhibit D, at pp. 112-113).

39. Plaintiff does not recall the date of his first fall. (Exhibit C, at 22:8-19).

40. Plaintiff recalls that the fall occurred when he attempted to sit down on a bench and slid off the bench onto the floor. (Exhibit C, at 30:19-31:10).

41. A guard was standing nearby and assisted Plaintiff in standing up. (Exhibit C, at 24:16-20).

42. After his first fall, Plaintiff did not ask to be taken to medical and did not ask for any additional assistance apart from being helped up. (Exhibit C, at 24:21-25:3).

43. Plaintiff did not believe he was hurt and did not file a sick call slip. (Exhibit C, at 32:10-15).

44. Plaintiff does not recall the date of the second fall; he guesses that it was weeks or months after the first fall. (Exhibit C, at 31:22-32:5; 33:20-22).

45. The second time Plaintiff fell, he hit his head and lost consciousness.  (Exhibit C, at 29:19-30:15).

46. Once again, a guard was nearby and took Plaintiff down to medical immediately.  (Exhibit C, at 32:24-33:19).

47. The first medical records documenting that a stretcher had been called for Plaintiff related to a fall is dated January 20, 2016 at around 1:15 p.m.  Plaintiff indicated to the provider that had fallen and hit his head.  (Exhibit D, at pp. 125-127).

48. On that date, Plaintiff advised a medical provider that he had lower back pain and requested a walker. (Exhibit D, at pp. 125-127).

49. Plaintiff indicated that he lost balance and fell.  (Exhibit D, at pp. 125-127).

50. Medical records indicate that prior to the fall Plaintiff refused to continue using his cane because he wanted a walker.  (Exhibit D, at p. 128). The provider further noted that Plaintiff "had purposely [fallen] on the floor in order to make his point."  (Exhibit D, at p. 128).

51. There was no sign of visible injury and it was noted that Plaintiff was ambulatory with a cane (Exhibit D, at p. 128); however, Plaintiff was given a warm compress and Motrin and advised to return if his condition worsened.  (Exhibit D, at p. 126)

52. In addition to being treated by medical on January 20, 2016, Plaintiff was also evaluated by two mental health providers.  (Exhibit D, at pp. 137-143).

53. After reporting that he lost his balance, labs were drawn to check his Lithium levels which revealed abnormal kidney function.  (Exhibit D, at pp. 140-143).

54. Based on this finding, Plaintiff's Lithium was discontinued and he was started on an alternative mental health medication, Risperdal.  (Exhibit D, at pp. 140-143).

55. Mental health evaluation notes from January 21, 2016 indicate that Plaintiff was walking with a cane.  (Exhibit D, at pp. 131-133).

56. The following day, on January 22, 2016, a stretcher was called to take Plaintiff to medical after he refused to walk for an evaluation related to back pain. (Exhibit D, at pp. 154-155).

57. Plaintiff reported that he had fallen the day before and complained of lower back pain. (Exhibit D, at pp. 152-153). He denied dizziness or weakness. (Exhibit D, at p. 153).

58. Plaintiff was noted to ambulate independently with a single point cane, was in no acute distress and successfully walked from his bed to the stretcher using his cane. (Exhibit D, at pp. 154-155).

59. A lumbar sprain and strain was identified and Plaintiff was provided with a warm compress and Acetaminophen, and it was determined that no other acute intervention was needed. (Exhibit D, at pp. 154-155).

60. Plaintiff was returned to the block via wheelchair without further complaints. (Exhibit D, at p. 155).

61. Plaintiff was seen by mental health that same day, reporting that medical told him his balance may be off because of his mental health medications. (Exhibit D, at pp. 156-157).

62. Plaintiff was calm and cooperative and did not appear to be in distress. (Exhibit D, at pp. 156-157). Plaintiff was reminded that his medications had recently been adjusted, that labs were being drawn and that he should continue on his Risperdal as ordered. (Exhibit D, at pp. 156-157).

63. Plaintiff began using a wheelchair at some point, but does not recall when. (Exhibit C, at 46:20-22). There is no evidence that Plaintiff was ever without a wheelchair after his January 22, 2016 visit to medical. (*See generally* Exhibit D).

64. On January 29, 2016, Plaintiff had his initial chronic care appointment with medical. (Exhibit D, at pp. 160-163).

65. Provider notes indicate that on that date, Plaintiff was using a wheelchair because he was losing balance when using his cane. (Exhibit D, at p. 160).

66. The provider further noted that Plaintiff did not have any neurologic issues, including normal upper and lower extremity movement.  (Exhibit D, at p. 162).

67. Plaintiff was prescribed an array of medications, including Aspirin, Methocarbamol, Acetaminophen, Triamcinolone acetonide cream, vitamins A & D cream, Metformin HCl tablet, Norvasc tablet, Hydrochlorothiazide tablet, Lisinopril Tablet and Dilantin.  (Exhibit D, at p. 162).

68. Plaintiff was also supplied with another wheel chair.  (Exhibit D, at p. 162).

69. Notes further indicate that Plaintiff was not suffering from urinary or fecal incontinence or neurologic deficits.  (Exhibit D, at p. 160).

70. On February 3, 2016, Plaintiff met with his Social Work Services Manager who noted that Plaintiff was using a wheelchair.  (Exhibit A, at ¶11).

71. On Friday, February 5, 2016, Plaintiff submitted a sick call that his legs were swelling and that he could barely stand up on them.  (Exhibit D, at p. 171).

72. Plaintiff was seen on Monday, February 8, 2016 by medical.  (Exhibit D, at pp. 177-179).

73. The following day, Plaintiff submitted a sick call complaining of pain in his right knee that he claimed to have injured in a fall the day before.  (Exhibit D, at p. 180).

74. Plaintiff was seen again on February 9, 2016.  (Exhibit D, at pp. 183-184).  He was in a wheelchair and reported pain in right knee from a fall.  (Exhibit D, at pp. 183-184).  He was x-rayed and given medication.  (Exhibit D, at pp. 183-184).

75. Plaintiff was seen on February 10, 2016 for a fall in the bathroom that occurred two (2) days prior.  (Exhibit D, at pp. 193-194).  He complained of back and knee pain.  (Exhibit D, at pp. 193-194).

76. In addition to wrapping his knee, an x-ray was ordered for the following day with instructions to follow-up with the physician's assistant via sick-call on February 12, 2016. (Exhibit D, at pp. 193-194).

77. On February 23, 2016, Plaintiff was seen by mental health on two occasions.  (Exhibit D, at pp. 226-227; 231-232; 233-236).  No acute intervention was needed on that date and

Plaintiff reviewed his mental health treatment plan and was scheduled to be evaluated by a physician or a nurse practitioner regarding the efficacy of his medication. (Exhibit D, at pp. 226-227; 231-232).

78. Plaintiff also spoke with a social worker about coping strategies to help him deal better with his stressors, incarceration, frustration and mood swings. (Exhibit D, at pp. 233-236).

79. On February 24, 2016, Plaintiff was brought to medical after another reported fall. (Exhibit D, at pp. 241-242). Plaintiff claimed that his legs gave out while trying to get off the toilet. (Exhibit D, at pp. 241-242).

80. On February 25, 2016, Plaintiff presented to mental health demonstrating delusional thoughts and he was urgently referred to psychiatry. (Exhibit D, at pp. 247-252).

81. Plaintiff was seen by a psychiatrist the next day and was agreeable to titration of his Risperdal and the addition of Benadryl to stabilize his mood. (Exhibit D, at pp. 257-259).

82. Plaintiff's medications were adjusted, he was informed of the side effects and benefits of the medication and he was made aware of the sick call process. (Exhibit D, at pp. 257-259).

83. On February 29, 2019, Plaintiff was seen for high blood pressure, right sided weakness and leg swelling. (Exhibit D, at pp. 260-262). At that time, he denied back pain. (Exhibit D, at pp. 260-262).

84. Plaintiff was sent to a medical triage nurse practitioner for further evaluation. (Exhibit D, at p. 264).

85. Patient presented to triage in his wheelchair requesting Percocet for pain. (Exhibit D, at pp. 265-266).

86. He did not have neurological deficits or bowel/intestinal issues and was provided with anti-embolism stockings and education to elevate legs, decrease his sodium and achieve weight loss with exercise. (Exhibit D, at pp. 265-266).

87. Plaintiff was seen on March 5, 2016.  (Exhibit D, at p. 281).  The provider indicated that Plaintiff did not have any heel drop or movement issues.  (Exhibit D, at p. 281).

88. On the same day, he was seen by mental health to assess the efficacy of his medication.  (Exhibit D, at p. 281-284).

89. Plaintiff reported that he was doing "fine" and his medications were refilled.  (Exhibit D, at pp. 281-284).

90. On March 9, 2016, Plaintiff was seen by mental health again and reported dry mouth and slurred speech but demonstrated appropriate behavior.  (Exhibit D, at pp. 289-290).

91. Plaintiff was noted to be sitting upright in his wheelchair on that date and was referred to psychiatry for evaluation of his medications.  (Exhibit D, at pp. 289-290).

92. Plaintiff was seen by a psychiatrist on March 11, 2016 and requested that he be re-started on his Lithium due to the side effects of the other medication and his history of being stable on Lithium in the past.  (Exhibit D, at pp. 298-300).

93. Plaintiff's labs were reviewed and his Lithium was restarted with an order to closely monitor his renal function.  (Exhibit D, at pp. 298-300).

94. On March 12, 2016, Plaintiff presented to medical in his wheelchair indicating pain all over body. (Exhibit D, at pp. 305-307).

95. The notes indicate that a medical referral was required because it was a recurrent complaint (2 x 72 hours) without urgent findings and for a medication review.  (Exhibit D, at pp. 305-307).

96. On March 14, 2016, Plaintiff presented to medical complaining of nocturia – frequent urination at night – and tingling in his hands.  (Exhibit D, at pp. 310-311).  An urgent appointment was made with a provider.  (Exhibit D, at pp. 310-311).

97. That same day he was seen by a physician assistant for the nocturia.  (Exhibit D, at pp. 312-313).

98. Urine labs were ordered for March 18, 2016.  (Exhibit D, at pp. 312-313).

99. Plaintiff submitted a grievance on March 15, 2016 requesting a new wheelchair. (Exhibit A, at ¶14). Records indicate the grievance was processed on March 17, 2016. (Exhibit A, at ¶15).

100. On March 24, 2016, Plaintiff was seen for multiple medical concerns, including right side weakness/numbness for the preceding two (2) weeks as well as blood in his stool. (Exhibit D, at p. 336)

101. Plaintiff was evaluated by psychiatry due to his concerns and it was noted that his Lithium was recently re-started and that repeat labs were pending that day. (Exhibit D, at p. 336).

102. It was noted that Plaintiff's mood had stabilized on the Lithium but he had multiple medical complaints (Exhibit D, at pp. 337-339).

103. The psychiatrist noted that Plaintiff had mild dysarthria which could be Lithium related; however, Plaintiff was on a low dose of Lithium and had been taking it for many years. (Exhibit D, at p. 336).

104. There were no other signs of Lithium toxicity and Plaintiff was referred to medical to rule out medical causes of his symptoms. (Exhibit D, at p. 336).

105. Regardless, Plaintiff's Lithium was held until labs confirmed that the level was non-toxic. (Exhibit D, at pp. 337-339).

106. On March 25, 2016, Plaintiff was seen by medical for bilateral ear infections. (Exhibit D, at pp. 340-342).

107. On March 26, 2016, Plaintiff was wheeled to medical by another inmate who advised medical staff that Plaintiff had become sluggish and less talkative. (Exhibit D, at pp. 349-350).

108. Plaintiff subsequently recounted that he was walking out of his cell when he slipped, falling backwards, striking his head on the doorjamb. (Exhibit E, at p. 1).

109. Plaintiff concedes he had been provided a wheelchair at that point, but does not recall why he was not using his wheelchair to exit the cell instead of walking. (Exhibit C, at 128:6-21).

110. On that date, Plaintiff only complained of bilateral feet pain and sores on scalp. (Exhibit D, at pp. 349-350). He was recorded as not being in acute distress. (Exhibit D, at pp. 349-350).

111. The notes indicate that Plaintiff had slurred speech, weakened motor strength in both upper extremities, and difficulty moving both legs. (Exhibit D, at pp. 349-350). As a result, Plaintiff was sent to the ER at Aria-Torresdale for further work-up. (Exhibit D, at pp. 349-350).

112. Plaintiff received treatment at Aria-Torresdale through April 12, 2016, when he returned to the infirmary at CFCF. (Exhibit D, at pp. 361-363).

113. Plaintiff concedes that there was never denied access to sick call slips or prevented from filing a sick call slip. (Exhibit C, at 26:3-18).

114. Although it usually took two or three days after filing a sick call slip to see a doctor, Plaintiff was never told after filing a sick call slip that he could not see a doctor. (Exhibit C, at 26:14-270).

115. Plaintiff additionally concedes that when he asked for assistance, it was never refused by a correctional officer. (Exhibit C, at 36:2-5; 44:24-45:9 ("No, the guards always helped me. The guards helped me a lot.")).

116. When asked if correctional officers ever kept Plaintiff from seeing medical staff, Plaintiff stated that they did not. (Exhibit C, at 43:10-17).

117. Plaintiff confirmed that while there may have been a delay, there was never a time when he requested medical attention and his request was denied. (Exhibit C, at 42:19-23).

118. Plaintiff concedes that to the extent he was not being treated, he has no basis to say that it was due to race apart from the fact that he believed he was not receiving treatment. (Exhibit C, at 130:1-131:12).

119. Plaintiff testified that prison guards told him they threw out his personal belongings while he was in the hospital, but he has not identified the responsible guards. (Exhibit C, at 52:9-56:13).

120. Plaintiff does not recall if he ever filed any grievances while at CFCF. (Exhibit C, at 114:5-18). There is no record of Plaintiff having filed more than one grievance. (Exhibit A).

121. While at CFCF from January 1, 2016 through March 26, 2016, Plaintiff was seen by medical and/or mental health on the following dates: January 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 15, 17, 19, 20, 21, 22, and 29; February 8, 9, 10, 11, 20, 22, 23, 24, 25, 26, and 29; March 4, 5, 9, 11, 12, 14, 22, 24, 25, and 26. (*See generally* Exhibit D).

122. Often, Plaintiff was seen by more than one provider and on more than one occasion per day. (*See generally* Exhibit D).

### IV.  **Expert Opinions**

123. Plaintiff has produced medical reports from Dr. Singer and Dr. Bonner who opine that Plaintiff's musculoskeletal symptomology were caused by falls in March of 2016. (Exhibits F and G).

124. Neither Dr. Singer nor Dr. Bonner offer opinions critical of the medical or mental health care provided to Plaintiff at CFCF. (Exhibits F and G).

125. Neither Dr. Singer nor Dr. Bonner relied upon records from Plaintiff's incarceration in their assessments of Plaintiff, and instead relied on his own statements to formulate opinions regarding the cause of Plaintiff's injuries. (Exhibits F and G).

126. Donald R. Reeves, Jr., M.D. is a Fellowship Trained Forensic Psychiatrist who is Board-certified by the American Board of Psychiatry and Neurology and a Diplomat for the American Board of Psychiatry and Forensic Psychiatry. (Exhibit H).

127. It is the opinion of Dr. Reeves that the mental health care provided to Plaintiff was thorough and appropriate and did not cause or contribute to Plaintiff's injuries in any way. (Exhibit I, at p. 6).

128. It is the opinion of Dr. Reeves that Plaintiff's unsteadiness on his feet was present before his admission to CFCF and was due to a longstanding compression of the nerves in his lower back. (Exhibit I, at p. 6).

129. It is the opinion of Dr. Reeves that Plaintiff's sudden change in mental status was due to sepsis associated with a urinary tract infection and neither of these conditions was associated with Plaintiff's mental illness or the treatment provided to Plaintiff by mental health staff. (Exhibit I, at p. 6).

130. It is the opinion of Dr. Reeves that the mental health care provided to Plaintiff at CFCF did not constitute deliberate indifference to Plaintiff's serious medical need as mental health clinicians evaluated Plaintiff on numerous occasions throughout his incarceration, properly diagnosed and treated Plaintiff's bipolar disorder and made appropriate changes in Plaintiff's medication when necessary. (Exhibit I, at p. 2).

131. It is the opinion of Dr. Reeves that mental health providers also properly monitored Plaintiff's psychiatric symptoms and made appropriate adjustments to his medications when his symptoms indicated such changes should be made. (Exhibit I, at p. 2).

132. In Dr. Reeves' opinion, the close attention and reaction to Plaintiff's medical and psychiatric status obviates any allegation of deliberate indifference. (Exhibit I, at p. 2).

133. It is further Dr. Reeves' opinion that the care provided to Plaintiff by his mental health providers did not constitute medical malpractice as his clinicians properly diagnosed and treated Plaintiff's mental illness and did so with consideration to his medical condition. (Exhibit I, at p. 2).

134. In Dr. Reeves' opinion, the several and serious medical illness that Plaintiff suffered had nothing to do with the mental health care provided to Plaintiff.  (Exhibit I, at p. 2).

135. David Clements, M.D. is a board certified orthopedic surgeon who is fellowship trained in spinal surgery. (Exhibit J).

136. Dr. Clements is of the opinion that Plaintiff had preexisting chronic back pain, neck pain and cervical stenosis prior to his 2016 incarceration.  (Exhibit K, at p. 2).

137. Dr. Clements is of the opinion that the treatment Plaintiff received during his incarceration in no way contributed to his spinal stenosis and did not aggravate what was a chronic long-term degenerative condition. (Exhibit K, at p. 2).

138. Sanford H. Davne, M.D. is a board certified orthopedic surgeon with fellowship training in the field of spina surgery and spinal disorders. (Exhibit M, at. p. 1)

139. Dr. Davne is of the opinion that the care and treatment provided to Plaintiff during his incarceration was reasonable, appropriate and within the accepted standard of care. (Exhibit M, at p. 8).

Respectfully submitted,

MATIS BAUM O'CONNOR
***Electronically Filed***

By:  */s/ Cassidy L. Neal*

Cassidy L. Neal, Esquire
PA I.D.311979
Attorneys for MHM Services, Inc.,
Defendants

Matis Baum O'Connor
912 Fort Duquesne Blvd
Pittsburgh, PA 15222
(412) 338-4750

**CERTIFICATE OF SERVICE**

      I, the undersigned, hereby certify that I am this day serving a true and correct copy of the foregoing JOINT DEFENSE STIPULATED STATEMENT OF MATERIAL FACTS upon all parties via ECF, this 20th day of December, 2019.

                MATIS BAUM O'CONNOR
                *Electronically Filed*

                By:  */s/ Cassidy L. Neal*

                      Cassidy L. Neal, Esquire
                      PA I.D. 311979
                      Attorneys for MHM Services, Inc., Defendant

                912 Fort Duquesne Blvd
                Pittsburgh, PA 15222
                (412) 338-4750