**Robert B. Sklaroff, M.D., F.A.C.P.**
Medical Oncology/Hematology

Smylie Times Building - Suite #500-C
8001 Roosevelt Boulevard
Philadelphia, PA 19152

☏ Telephone: (215) 333-4900
🖷 Facsimile: (215) 333-2023

✉ rsklaroff@gmail.com

🕒 May 29, 2017

Stephen H. Cristal, Esquire
Goldfein and Joseph, P.C.
1880 John F Kennedy Blvd., 20th Floor
Philadelphia, PA 19103-7425
Phone: (215) 564-6688

re: Leslie Boyd
[B.D. 12/6/1948]

Dear Mr. Cristal:

The records regarding the management of the above-denoted patient were reviewed; these conclusions have been drawn to a reasonable degree of medical certainty and probability.

### *Introduction*

This report is based on the information reviewed to-date, which I consider to be generally reliable—unless evidenced otherwise—and which are the type of data upon which I rely and are routinely relied upon by physicians and paraprofessionals when delivering contemporary medical care (including medical and nursing records, laboratory reports, diagnostic tests and imaging, and consultant reports). If/when further data are acquired, the right is reserved to modify this report accordingly. These opinions are based on my education, training, and (35+ years') experience in assessing patients with conditions similar to those of this patient as depicted therein; I have worked with medical office and hospital staff, including medical technologists and nurses in office settings, hospitals and other venues (*e.g.*, summer-camp doctor, outpatient clinic, short-term *locum tenens*). I led (at multiple levels) the Organized Medicine's Hospital (later "Organized") Medical Staff Section and was President of a Medical Staff (John F. Kennedy Memorial Hospital). I am familiar with (and have applied) standards of the Joint Commission for the Accreditation of Healthcare Organizations. I have participated in the development and use of protocols, policies and procedures for the care of patients with myriad medical conditions including those this patient experienced. I am an Attending Physician in the Department of Medicine at Nazareth Hospital in Philadelphia, Pennsylvania); I have served on its Bylaws Committee for many years.

I graduated medical school at the Thomas Jefferson University (1974). I completed an Internal Medicine internship/residency program at the Henry Ford Hospital (1977); I then completed Hematology/Medical-Oncology Fellowships at the Memorial Sloan-Kettering Cancer Center (1979) and Hahnemann University (1980). I have been licensed in the Commonwealth of Pennsylvania (and have been in the continuous practice of medicine) since 1979; except for my training-period, I have not been licensed elsewhere. I am Board-Certified in Internal Medicine (1977) and in Medical Oncology (1979) through the American Board of Medical Specialties; I am certified by the American Board of Independent Medical Examiners (2009) and I am a Fellow of the American College of Physicians. My *curriculum vitae* is attached.

The ethical approach to preparing this analysis adheres to the Expert Witness Affirmation of a national professional society [the American College of Obstetrics and Gynecology], to wit:

> As a member of the medical profession, I affirm my duty, when giving evidence or testifying as an expert witness, to do so solely in accordance with the merits of the case. I declare I will uphold these professional principles in providing expert evidence or expert witness testimony:
>
> > I will always be truthful.
> >
> > I will conduct a thorough, fair and impartial review of the facts and the medical care provided, not excluding any relevant information.
> >
> > I will provide evidence or testify only in matters in which I have relevant clinical experience and knowledge in the areas of medicine which are the subject of the proceeding.
> >
> > I will evaluate the medical care provided in light of generally accepted standards, neither condemning performance that falls within generally accepted practice standards nor endorsing or condoning performance that falls below these standards.
> >
> > I will evaluate the medical care provided in light of the generally accepted standards which prevailed at the time of the occurrence.
> >
> > I will provide evidence or testimony that is complete, objective, scientifically based and helpful to a just resolution of the proceeding.
> >
> > I will make a clear distinction between a departure from accepted practice standards and an untoward outcome.
> >
> > I will make every effort to determine whether there is a causal relationship between the alleged substandard practice and the medical outcome.
> >
> > I will submit my testimony to peer review, if requested by a professional organization to which I belong.
> >
> > I will not accept compensation contingent upon the outcome of the litigation.

I have not been involved clinically with the specific episode[s] of care reviewed herein. I have never had any relationship, affiliation or conflict of interest with the patient whose management is the subject of this review [or the patient's authorized representative, if there is one]. I have no material professional, familial or financial conflict-of-interest with any entities linked to this review [including any referring body, insurer, provider, facility, pharmaceutical agent, device, procedure, and/or therapy]. There is no intent to establish a patient/doctor relationship; opinions herein do not constitute recommendations as to any specific intervention.

I am familiar with (for my practice includes, within its scope of licensure) medical conditions (including procedures) this patient experienced—as well as their complications and associated phenomena—serving as the basis of this report. I am aware of the prevailing (and minimum) professional standards of care applicable to providing medical services (diagnostic/therapeutic, outpatient/inpatient) under like/similar circumstances as those encountered in this case, contemporaneous with when key patient-encounters transpired; I typically manage medical conditions comparable to those in specific case and, thus, I have current, relevant experience and/or knowledge to render a determination for this case.

Regarding assessment of the issues in this case, my specialty is similar to that of involved practitioners. All evidence-based opinions rendered herein are based on my knowledge, training and experience; they are based on the information available for review and are held to a reasonable degree of clinical certainty and/or probability. I am aware how these conclusions apply nationally/locally to internists (including primary-care physicians), medical oncologists and hematologists; variation is rare, but I can differentiate national standards from those used in the same/similar regions as Philadelphia, PA.

I have composed hundreds of reports, have been deposed on 60+ occasions, and have provided in-court testimony on 30+ occasions. I have never been disqualified as an expert witness and none of my opinions have been disqualified in any administrative forum or legal proceeding. I have never been found guilty of fraud or perjury. I have no financial interest in the outcome of this case. I retain no prior drafts of this final report, and I have maintained no notations (either written on or separate from the submitted information). I have not relied upon summaries of the database, instead ensuring that all cited information is derivative of primary sources that have been listed. Conclusions are of three general types (agreement, disagreement and lack of disagreement), noting in particular that the "lack of disagreement" recognizes existence of myriad schools-of-thought in a particular discipline.

The foundations of my opinions meet these criteria [http://en.wikipedia.org/wiki/Daubert]:

1. They have been tested clinically (and not just in a laboratory).
2. They have been subject to peer review and publication.
3. Their known or potential rate of error is zero, or low enough to be close to zero.
4. Standards exist for the control of their applicability.
5. They are generally accepted within the relevant scientific community.

### *Database*

The medical records upon which this report has been based are as follows:

> Curran-Fromhold Correctional Facility [2/12/2016 – 6/3/2016]
> Aria Hospital (Torresdale) [3/26/2016 – 4/12/2016]
> Anthony DeEugenio, D.C. [1/13/2017 – 3/9/2017]

Although the records are comprised of 2000+ pages, key-information can be gleaned therefrom; here, psychological (bipolar) and medical (DM/hypertension) concerns are not at-issue, for the focus is upon assessing the three components of a professional liability claim, namely [1]—whether a deviation from the standard-of-care occurred, [2]—whether that deviation resulted in definable injury, and [3]—whether the injury would not have transpired absent the deviation. Here, the problems are principally orthopedic in nature, as depicted on the appended excerpted-pages from the three information sources. Ultimately, it is necessary to depend on medical data more than on what the patient has related.

## *Overview*

The case-summary provided by Dr. Lepley notes that the patient was admitted to Aria (Torresdale) after having sustained cervical-cord compression; thus, it is necessary to assess the progress notes generated @ CFCF that are mutually exclusive of the background issues that prompted him to seek the attention of prison personnel to assess "[1]". The injury was well-defined in the operative-note, in the subsequent MRI, and in the associated examination that was completed this year; thus, it is not difficult to conclude that "[2]" has been satisfied and, indeed, constitutes a constellation of impairments that will likely persist and yield permanent disability. Patients often have a silent predisposition to be developing degenerative spinal arthritis/disc disease; it is necessary to confirm that earlier diagnosis would have precluded the acute/subacute/chronic residua of the acute cord-compression so as to satisfy "[3]".

## *Case Narrative – Pre-Event*

He was a 66 year-old male when, on 12/31/2015, he was incarcerated due to having been charged with assault during a family dispute; according to a note on 2/9/2016, he had a court-date on 2/16/2016. {Unclear is why he had been an inmate a year earlier *vide infra*; regardless, key-events were in 2016.}

On 2/10/2015, he had tried to hang himself at the police-HQ Roundhouse; professional personnel viewed this only as a gesture that, nevertheless, triggered ongoing counseling. He reported having used Lithium in the past (but not at-present) and baseline blood studies were normal; it was prescribed.

On 9/15/2015, he was using Seraquel h.s. and chronic constipation was noted.

On 11/11/2015, he was found to have hyperlipidemia, prompting initiation of Atorvastatin; he had a rash, for which Clortrimazole Cream was prescribed. He received Pneumovax and used Tylenol prn-pain.

On 1/2/2016 & thereafter, he was treated with Percocet for a herniated disc; there was no physical assessment provided on that date (neither orthopedic nor neurologic). BPH was noted, but not treated.

On 1/6/2016, he was given Benadryl h.s. and felt he was stable when ingesting Lithium 30o mg. h.s.

On 1/22/2016, he reported having fallen "the other day" and "refused to walk to Medical"; he used his single-point cane and was able to move his arms; he had no tremor or rigidity and reflexes were +1. Because his creatinine was slightly elevated [1.42, N < 1.30], the Lithium was replaced with Risperidal.

On 2/9/2016, he was placed into segregation after an argument with a minister while in church services (because "he was talking about hell and damnation"); he was in a wheelchair (absent an explanation).

On 2/10/2016, he fell in the bathroom, reporting he was "having problems with my equilibrium and they won't give me a walker." He was given Motrin for pain in his back and head (which he said he'd struck).

On 2/20/2016, he complained of tingling in his right hand and pounding in his head; he became unruly and was escorted from Medical Triage, with the plan being to ensure he ingested his medications.

On 2/23/2016, it was noted that his court-date had been rescheduled for 4/5/2016 (inexplicably).

On 2/29/2016, he complained *inter alia* of weak legs, but the neurological examination was normal.

On 3/11/2016, he requested that the Lithium be restarted because he had a dry mouth.

On 3/14/2016, he complained of hand parasthesias [possibly due to DM-induced neuropathy, but neurological examination was not performed and neurophysiologic studies were not ordered].

On 3/24/2016, he was seen by Marc Pimsleur, M.D. for right-sided numbness/weakness during the prior fortnight, hematochezia, and mild dysarthria; he deferred performing an examination and, instead, obtained lab studies that showed BUN=43 with Creatinine=1.04 [suggesting GI-bleed +/- dehydration]. Medications were adjusted but, although a Lithium level was not acquired, he wrote that he would "hold Lithium until labs confirm level to be nontoxic." Benadryl was held due to its being sedating.

On 3/26/2016, due to bowel incontinence and leg weakness, he was promptly referred to Aria's ER. [Although the evaluation occurred in the a.m., the time of the visit was blocked by squares (□).]

Throughout, it is unclear how the diagnosis of vertebral discogenic disease had been discerned and, along with the absence of neurological examinations, it appears no effort was made to acquire records; therefore, acquiring a "roadmap" of what was occasionally driving him to take to his wheelchair simply by ordering a spinal MRI (noting the C-spine was the cause of the cauda equina syndrome, *vide infra*) would have provided an early-warning that cord-compression was imminent. This should have been a priority throughout 2016 but, in particular, when persistent neurological complaints (including "falls") were being reported by a semi-reliable historian. Indeed, no effort was made to discern why he was using assistive devices (a cane regularly, a walker occasionally and, ultimately, a wheelchair).

*Case Narrative – Event*

The entire Aria (Torrsdale) chart has not been provided; nevertheless, it can be concluded that the medical personnel thereat provided impeccable care, first focusing on medical issues and then surgical.

Once cord-compression starts, it is vital to relieve it within one day if full-recovery is envisioned but, here, he was admitted with encephalopathy and multi-organ failure; therefore, after he was stabilized, he underwent a C-spine discectomy on 4/6/2016. Thus, particularly noting the dehydration prodrome, his subacute decline during the prior 1-2 weeks was characterized by the development of complications of the cord-compression ("upon arrival, he was hypothermic, bradycardic and hypotensive"). Indeed, multiple contacts with prison personnel had failed to prompt them to try to diagnose his ailment[s].

*Case Narrative – Post-Event*

Immediately following discharge, he was transferred to a prison infirmary but, notwithstanding the plan for neurosurgical follow-up within a fortnight, he was only provided physiotherapy thereafter; the issue of whether to perform a LS-Spine laminectomy due to the cauda equina syndrome had been deferred because of the presumed chronicity of the ailment—as opposed to the urgency of the C-Spine status— but the patient was left with both weakness and the need for a Foley Catheter. The imaging studies that were acquired thereafter [5/3/2017] demonstrate that multi-level findings persistent, and he should be assessed for another surgical procedure; he also merits medical follow-up *inter alia* of his pancytopenia. That noted, however, the deterioration from the C-Spine had been noted in the acute-care setting due to both radiculopathy and myelopathy, as per the neurosurgeon's pre-operative progress note [432017]. No one opined regarding the etiology of the vertebral disease[s], other than to note their existence.

5

## *Discussion*

The existence of spinal-DJD/DDD was recognized while the patient was incarcerated, but the only effort to manage this problem was to continue prescribing narcotics; even when the patient reported pain and weakness, neurological examinations were uncommon and incomplete, and neither neurophysiologic nor imaging studies were ordered. His metabolic derangements have resolved post-hospitalization, but pain and weakness persist; it seems he is viewed as having reached an endpoint in acute-management.

It cannot be determined if/when he might have sustained any particular traumatic event while at CFCF that might have triggered the C-Spinal disease to have become acutely symptomatic; his reports of falls are noted, but these were probably manifestations of his decline rather than the etiology thereof. Thus, absent a neurosurgical follow-up evaluation, it is not possible to conclude he is not a candidate for any further intervention; it can be concluded that, nevertheless, the urgency of repairing the C-Spine DJD was viewed by the Neurosurgeon as the priority, once the patient could be cleared medically for it.

Perhaps the most insightful observations were provided by the Neurosurgeon [Zakaria Hakma, M.D.] within his initial consultation [4/1/2016] for, while initially indecisive as to the plan (pending studies), preference was placed upon the C-Spine after he noted both upper and lower extremity weakness. Presumably, he felt that this approach would alleviate symptoms on both levels as an initial intervention (as opposed to operating on the LS-Spine, which would not affect any functioning above this level.

## *Summary*

Recall the three components of a professional liability claim, namely [1]—whether a deviation from the standard-of-care occurred, [2]—whether that deviation resulted in definable injury, and [3]—whether the injury would not have transpired absent the deviation. It remains true, following detailed analysis, that the problems are principally orthopedic in nature, as depicted on the appended excerpted-pages from the three information sources; to whatever degree the renditions of the pre-hospitalization events may differ, the lack of reliability of the historian was compounded by the paucity of efforts to probe him.

It was determined *supra* that deviations occurred, allowing the cord-compression to occur; this satisfies [1] and [2]. The residual challenge is to define the degree to which the patient's outcome contains a set of impairments that relate more to the residual LS-Spine anomalies than to the repaired C-Spine lesions. This was empirically assessed behaviorally by Dr. Hakma when the C-Spine lesions were repaired, to wit, that they were the neurologic priority; responsibility for absent follow-up (to assess the LS-Spine) rests with the prison-personnel [unless additional medical records are extant, but have not been provided].

Because subsequent examinations by Dr. DeEugenio do not include the assessment of muscle strength, comparison with the consultation of Dr. Hakma cannot be provided; that the patient seems still to be wheelchair-bound suggests he has plateaued. Indeed, it is unclear what has transpired more recently (including, as discussed *supra*, medical and neurological follow-up), regardless of whether he is/isn't still incarcerated (at CFCF or elsewhere). Thus, allowing cord-compression to persist increased the risk that the patient would experience permanent impairments, although this can only be concluded subjectively. Subject to review of such information acquired in the interim—more than a year post-laminectomy— definitive conclusions can be reached regarding how much (a)—his legs benefitted from the C-Spine procedure, and [b]—his residual leg symptoms have worsened due to the absence of LS-Spine surgery.

This depicts how far one can link [1] and [2] with [3], pending a more focused up-to-date assessment.

Sincerely,

*Robert B. Sklaroff, M.D.*