# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LESLIE BOYD** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 17-3195** |
| | : | |
| **CITY OF PHILADELPHIA, et al.** | : | |
| *Defendants.* | : | |

## MEMORANDUM

Currently before the Court are the following: Defendant MHM Services, Inc.'s Motion for Summary Judgment and Memorandum (ECF No. 47), Defendant Corizon Health Inc.'s Motion for Summary Judgment and Memorandum (ECF No. 48), Defendant City of Philadelphia's Motion for Summary Judgment and Memorandum (ECF No. 49), Plaintiff Leslie Boyd's Response in Opposition to Defendants' Motions (ECF No. 54), Defendant City of Philadelphia's Reply in Further Support of its Motion (ECF No. 55), Defendant MHM Services, Inc.'s Reply in Further Support of its Motion (ECF No. 56), and Defendant Corizon Health Inc.'s Reply in Further Support of its Motion (ECF No. 57).

For the following reasons, the Court grants Defendants' Motions for Summary Judgment, collectively, in the accompanying Order.

## I.    BACKGROUND

On May 23, 2017, following an injury he suffered while incarcerated at the Curran-Fromhold Correctional Facility, Plaintiff, Leslie Boyd, filed a Complaint in

the Court of Common Pleas of Philadelphia County.  Plaintiff brought claims against the Correctional Facility, the City of Philadelphia ("City"), and two corporations that provide medical services at the Correctional Facility, Corizon Health, Inc. ("Corizon") and MHM Services, Inc. ("MHM") for violations of Title II (public services) and Title III (public accommodations) of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("RA"), 42 U.S.C. § 1983 ("§ 1983"), Pennsylvania Human Relations Act, Pennsylvania Constitution, and Pennsylvania common law claims for medical malpractice, negligence, and intentional infliction of emotional distress ("IIED"), without identifying which of these claims pertained to which of the Defendants.

On July 10, 2017, MHM removed the case to this Court on the basis of federal-question subject matter jurisdiction. 28 U.S.C. § 1331.

All three Defendants filed separate Motions to Dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See* ECF Nos. 3, 5, 8. Plaintiff responded to each motion. *See* ECF Nos. 6, 7, 10.  Judge Goldberg granted Defendants' motions, *see* ECF No. 12, but allowed Plaintiff to file an amended complaint as to all counts, except for "(1) his claims under the Pennsylvania Human Relations Act, (2) his claims for monetary damages under the Pennsylvania Constitution, and (3) his claims for medical malpractice and IIED against the City." ECF No. 12 at 16.

On June 28, 2018, Plaintiff filed a Motion for Reconsideration of Judge Goldberg's Order dismissing Plaintiff's medical malpractice claims against MHM and Corizon for his failure to timely file certificates of merit. *See* ECF No. 13.[1]

On the same day, Plaintiff filed his Notice of Filing and Service of Amended Complaint, which was dated June 27, 2018. *See* ECF No. 14. Defendants timely responded to Plaintiff's Amended Complaint, again, with Motions to Dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See* ECF Nos. 16, 18, 19. With the parties in agreement, Judge Goldberg allowed Plaintiff additional time to respond to the motions.

Meanwhile, on November 26, 2018, this case was reassigned from Judge Goldberg to this Court. *See* ECF No. 26. This Court denied Plaintiff's motion for reconsideration, *see* ECF No. 29, as well as Corizon's and MHM's motions to dismiss, *see* ECF Nos. 28, 30. This Court granted the City's motion as to Plaintiff's IIED claim because Judge Goldberg previously dismissed that claim without granting Plaintiff leave to amend, and denied the remainder of the City's motion. *See* ECF No. 31.

---

[1] Judge Goldberg's decision allowed Plaintiff to seek reinstatement of his medical malpractice claims as to Corizon and MHM by presenting evidence sufficient to establish a legitimate excuse for [his failure to timely file certificates of merit] that meets the "high bar" required by Pennsylvania law. *Stroud v. Abington Mem'l Hosp.*, 546 F. Supp. 2d 238, 252-53 (E.D. Pa. 2008).

All Defendants timely answered Plaintiff's Amended Complaint. *See* ECF Nos. 32, 33, 35. A pretrial conference was held on December 13, 2018 and this Court issued a Scheduling Order that outlined critical discovery deadlines. *See* ECF No. 36. On July 8, 2019, Plaintiff filed a motion to extend discovery, *see* ECF Nos. 42-43, and this Court increased Plaintiff's time to complete fact discovery from April 12, 2019 to September 7, 2019, as well as his time for expert discovery from June 11, 2019 to October 7, 2019, *see* ECF Nos. 36, 45.

Over five months passed since this Court granted Plaintiff's motion to extend discovery deadlines, and without a dispute to which this Court is aware, Defendants filed the instant motions.

The parties did not submit a joint stipulation of material facts. Instead, Defendants submitted a "Joint Defense Statement of Material Facts," *see* ECF No. 47-1, and Plaintiff responded by admitting or denying the individual paragraphs, *see* ECF No. 54, leaving it for this Court to decipher where the parties agree. Moreover, Plaintiff's response in opposition to Defendants' motions identifies the material facts as follows:

> Plaintiff incorporates herein the facts stated in the Response to Joint Defense Statement of Material Facts and those in Plaintiff's Exhibits 1-4 and Defense Exhibits D-G, and in the Amended Complaint.[2]

---

[2] Plaintiff submits Exhibit 1 as "VERIFIED STATEMENT OF LESLIE BOYD," *see* ECF No. 52-1. The first paragraph states, "I make this verified statement in opposition to the summary judgment motions." *Id*. at 1. "[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 623–24 (3d

ECF No. 52 at 3. Therefore, unless otherwise noted, the factual background contained herein derives from the Court's cross-reference of the two documents (i.e. "Joint Defense Statement of Material Facts," *see* ECF No. 47-1, and Plaintiff's response, *see* ECF No. 54), as well as the Amended Complaint, with all inferences drawn in a light most favorable to the non-moving party, Plaintiff.

**A. Relevant Facts**

At all times relevant, Plaintiff was an inmate at the Curran-Fromhold Correctional Facility ("CFCF").

The City of Philadelphia contracted with MHM to provide mental health care services to inmates at CFCF. ECF No. 47-1 at ¶ 3.

During the period of January 1, 2016 through March 31, 2016, the City of Philadelphia contracted with Corizon to provide general medical services to inmates at CFCF. *Id*. at ¶ 8. Corizon was responsible for reviewing inmate sick calls, scheduling inmate appointments with its care providers, and determining what course of treatment, if any, to provide to an inmate. *Id*. at ¶¶ 8, 9.

Plaintiff arrived at CFCF on January 1, 2016 and a nurse conducted his intake assessment. *Id*. at ¶ 20. Plaintiff's medical history included a herniated disc

---

Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991)). Insofar as Plaintiff's Exhibit 1 attempts to contradict Plaintiff's prior deposition testimony, without explanation and/or any independent record evidence to support the contradiction, this Court, in its discretion, disregards it.

for which he was taking Percocet and Tylenol #3, and Bipolar disorder for which he had previously treated with Lithium. *Id*. There is no evidence that Defendant requested any accommodations at this time. *Id*. at 19. Nevertheless, Plaintiff was provided with a lower bunk. *Id*. at ¶ 21.

On January 4, 2016, Plaintiff complained of low back pain stemming from a motor vehicle accident that occurred roughly ten years earlier. *Id*. at ¶ 24. Medical providers responded to Plaintiff's complaint. *Id*. The notes indicate that Plaintiff limped with discomfort while walking. *Id*. Medical providers treated Plaintiff with a warm compress and Naproxen. *Id*. at ¶ 25. They instructed Plaintiff to increase his hydration and scheduled him an appointment for further evaluation. *Id*. at ¶ 25.

On January 5, 2016, Plaintiff complained of chest pain and a headache. *Id*. at ¶ 27. During his examination, Plaintiff reported that he was prone to falls and needed a cane. *Id*.

On January 6, 2016, a physician's assistant conducted the follow-up evaluation for Plaintiff's back pain. *Id*. at ¶ 29. The physician's notes indicate that Plaintiff was ordered to continue with Naproxen through January 15, 2016. *Id*. Also, on January 6, 2016, a psychiatrist evaluated Plaintiff regarding his mental health needs. *Id*. at ¶ 30. Plaintiff explained that he did not want any changes made to his medications. *Id*. During his visit, Plaintiff reported no suicidal or homicidal

ideations and had no psychotic symptoms. *Id*. ¶ 31. Medical providers ordered Lithium for Plaintiff that same day. *Id*.

On January 10, 2016, Plaintiff complained that he felt dizzy and weak. *Id*. ¶ 32. During his visit, Plaintiff denied back pain, lightheadedness, and numbness. *Id*. Medical records indicate that Plaintiff was found sitting on his bottom bunk bed and, while seated, he stated that he had not gone out for his "accu check." *Id*. ¶ 33. He was assisted to a stretcher and brought to medical. *Id*. Plaintiff was given his morning medicine and educated on the importance of having his "accu checks" completed and his blood pressure checked. *Id*. Plaintiff also met with his mental health providers that day. *Id*. ¶ 34.

On January 15, 2016, Plaintiff underwent a routine general medical examination at which time his "labs" were drawn and assessed. *Id*. ¶¶ 35, 36.

On January 17, 2016, in response to Plaintiff's abnormal lab results and self-reported diabetes, medical providers ordered a "diagnostic profile." *Id*. ¶ 37.

On January 19, 2016, Plaintiff placed a "sick call" to have his blood pressure checked and "accu check" completed and the medical providers attended to his request. *Id*. During that visit, Plaintiff confirmed he had not taken his blood pressure or diabetes medication. *Id*. at ¶ 38. Medical providers explained to Plaintiff that he must take all prescribed medications. *Id*. Records from the visit indicate that Plaintiff was using a cane. *Id*. at ¶ 37.

Plaintiff does not recall the exact dates of his falls. Plaintiff's first fall occurred when he attempted to sit down on a bench. *Id*. at ¶ 40. A nearby guard helped Plaintiff to his feet. *Id*. at ¶ 41. Plaintiff believes his second fall occurred weeks or months after the first fall. *Id*. at ¶ 44. As a result of his second fall, Plaintiff hit his head and lost consciousness. *Id*. at ¶ 45. And, again, a nearby guard assisted Plaintiff and immediately took him to medical. *Id*. at ¶ 46.

The first medical record related to one of Plaintiff's falls is from January 20, 2016. *Id*. at ¶ 47. Records show that Plaintiff requested a walker and advised a medical provider that he was experiencing lower back pain. *Id*. at ¶ 48. Plaintiff indicated that he lost his balance and fell. *Id*. at ¶ 49.

In addition to being treated by medical on January 20, 2016, two mental health providers evaluated Plaintiff. *Id*. at ¶ 52. After reporting that he had lost his balance, medical providers checked Plaintiff's Lithium levels which revealed abnormal kidney function. *Id*. at ¶ 53. Based on this finding, medical providers decided to discontinue Plaintiff's Lithium, and start him on an alternative mental health medication, Risperdal. *Id*. at ¶ 54. The mental health evaluation notes from January 21, 2016 indicate that Plaintiff was walking with a cane. *Id*. at ¶ 55.

The following day, January 22, 2016, Plaintiff refused to walk to his scheduled evaluation for his back pain. *Id*. at ¶ 56. Therefore, medical requested a stretcher to transport Plaintiff. *Id*.

During his evaluation, Plaintiff reported that he had fallen the day before and he continued to complain of lower back pain. *Id*. at ¶ 57. He denied dizziness or weakness. *Id*. He was able to ambulate independently with a single point cane, he was in no acute distress, and he successfully walked from his bed to the stretcher using his cane. *Id*. at ¶ 58. Medical providers identified a lumbar sprain and strain. *Id*. at ¶ 59. They provided Plaintiff with a warm compress, Acetaminophen, and determined that no other acute intervention was needed. *Id*. at ¶ 59. Plaintiff returned to his cell block via wheelchair without further complaints. *Id*. at ¶ 60.

That same day, Plaintiff attended an appointment with his mental health providers. *Id*. at ¶ 61. Plaintiff suggested that his weak balance may have been caused by his mental health medications. *Id*. Because Plaintiff's medications had just recently been adjusted, and while his labs were still being evaluated, Plaintiff continued on his Risperdal. *Id*. at ¶ 62.

On January 29, 2016, Plaintiff had his initial chronic care appointment with medical staff. *Id*. at ¶ 64. The notes from that appointment indicate that Plaintiff was using a wheelchair because he was losing balance when using his cane. *Id*. at ¶ 65. Plaintiff did not have any neurological issues, including normal upper and lower extremity movement. *Id*. at ¶ 66. Plaintiff was prescribed Aspirin, Methocarbamol, Acetaminophen, Triamcinolone acetonide cream, vitamins A & D cream, Metformin HCl tablet, Norvasc tablet, Hydrochlorothiazide tablet,

Lisinopril tablet, and Dilantin. *Id*. at ¶ 67. Plaintiff was not suffering from urinary or fecal incontinence or neurological deficits at the time. *Id*. at ¶ 69.

On February 5, 2016, Plaintiff submitted a "sick call" because his legs were swelling, and he could barely stand on them. *Id*. at ¶ 71. On February 8, 2016, medical providers attended to Plaintiff. *Id*. at ¶ 72.

On February 9, 2016, Plaintiff submitted another "sick call" for pain in his knee stemming from a fall the day before. *Id*. Plaintiff arrived to medical in a wheelchair. *Id*. at ¶ 74. He was x-rayed and given additional medication. *Id*.

On February 10, 2016, medical providers examined Plaintiff and decided to wrap his knee and order x-rays, with instructions to follow-up with a physician's assistant via sick-call on February 12, 2016. *Id*. at ¶ 76.

On February 23, 2016, Plaintiff attended two sessions with his mental health providers. *Id*. at ¶ 77. During those visits, Plaintiff reviewed his mental health treatment plan and scheduled an appointment with a physician or a nurse practitioner regarding the efficacy of his medication. *Id*. Plaintiff also spoke with a social worker about coping strategies to help him deal better with incarceration, stressors, frustration, and mood swings. *Id*. at ¶ 78.

On February 24, 2016, Plaintiff suffered another fall. *Id*. at ¶ 79. Plaintiff explained that his legs gave out while trying to get off the toilet. *Id*.

On February 25, 2016, Plaintiff presented himself to mental health demonstrating delusional thoughts. *Id*. at ¶ 80. Mental providers immediately referred him to the psychiatric unit. *Id*. at ¶ 80.

The next day, following an evaluation, a psychiatrist agreed to a titration of his Risperdal and added Benadryl to help stabilize his mood. *Id*. at ¶ 81.

On February 29, 2019, a medical triage nurse evaluated Plaintiff for high blood pressure, right-side weakness, and leg swelling. *Id*. at ¶¶ 83, 84. The notes from the evaluation indicate that Plaintiff arrived at triage in his wheelchair requesting Percocet for pain. *Id*. at ¶ 85. He did not show neurological deficits or intestinal issues. *Id*. at ¶ 86. He was given anti-embolism stockings and instructed to elevate legs, decrease his sodium intake, and exercise. *Id*.

During an evaluation on March 5, 2016, Plaintiff did not present any heel drop or movement issues. *Id*. at ¶ 87. That same day, mental health providers evaluated Plaintiff to assess the efficacy of his medications. *Id*. at ¶ 88. At that time, Plaintiff reported that he was doing "fine." *Id*. at ¶ 89.

On March 9, 2016, Plaintiff reported that he was suffering from dry mouth and slurred speech but demonstrated appropriate behavior. *Id*. at ¶ 90. During his evaluation, Plaintiff presented as sitting upright in his wheelchair. *Id*. at ¶ 91. Plaintiff scheduled a visit with the psychiatric unit for an evaluation of his medications. *Id*. at ¶ 91.

On March 11, 2016, a psychiatrist evaluated Plaintiff and prescribed that he re-start his Lithium due to the side effects of the other medications, as well as his history of being stable on Lithium in the past. *Id*. at ¶ 92. Therefore, after reviewing Plaintiff's labs, medical providers restarted Plaintiff on Lithium with an order to closely monitor his renal function. *Id*. at ¶ 93.

On March 12, 2016, Plaintiff presented himself to medical in his wheelchair complaining of pain all over his body, which required a medical referral and review due to the reoccurring nature of his complaint. *Id*. at ¶¶ 94, 95.

On March 14, 2016, Plaintiff, again, presented himself to medical complaining of nocturia (frequent urination at night) and tingling in his hands. *Id*. at ¶ 96. Medical providers made an urgent appointment with a physician's assistant and one attended to Plaintiff that same day. *Id*. at 97.

On March 15, 2016, Plaintiff submitted a grievance requesting a new wheelchair, which was processed on March 17, 2016. *Id*. at ¶ 99.

On March 24, 2016, Plaintiff was seen for multiple medical concerns, including right-side weakness and numbness, as well as blood in his stool. *Id*. at ¶ 100. The psychiatric unit participated in this evaluation, as well. *Id*. at ¶ 101.

The psychiatrist noted that Plaintiff had mild dysarthria which could be Lithium related. *Id*. at ¶ 103. There were no other signs of Lithium toxicity and

Plaintiff was referred back to medical to rule out any other potential causes of his symptoms. *Id*. at ¶ 104.

On March 25, 2016, medical treated Plaintiff for bilateral ear infections. *Id*. at ¶ 106.

On March 26, 2016, another inmate wheeled Plaintiff to medical because he noticed Plaintiff had become sluggish and less talkative. *Id*. at ¶ 107. Plaintiff recounted that he was walking out of his cell when he slipped, falling backwards, striking his head on the doorjamb. *Id*. at ¶ 108.

Plaintiff received treatment at Aria-Torresdale through April 12, 2016 for his injuries. *Id*. at ¶ 112. Plaintiff returned to the infirmary at CFCF. *Id*. at ¶ 112.

Plaintiff concedes that, to the extent he was not being treated, he has no basis to say that it was due to his race. *Id*. at ¶ 118.

There is no record of Plaintiff having filed more than the one grievance regarding his wheelchair. *Id*.

While at CFCF from January 1, 2016 through March 26, 2016, Plaintiff was seen by medical and/or mental health on the following dates: January 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 15, 17, 19, 20, 21, 22, and 29; February 8, 9, 10, 11, 20, 22, 23, 24, 25, 26, and 29; March 4, 5, 9, 11, 12, 14, 22, 24, 25, and 26. *Id*. at ¶ 121.

Often, Plaintiff was seen by more than one provider on more than one occasion per day. *Id*. at ¶ 122.

In his Amended Complaint, Plaintiff alleged he "[is] a qualified disabled individual, being both physically and mentally handicapped." *See generally* ECF No. 15. Plaintiff described his physical disability as "severe cervical and lumbar spinal compression, stenosis and herniation, so substantial that he suffered from incontinence, cauda equine syndrome, imbalance vertigo, unbearable, pain and other symptoms." *Id.* He described his mental disability as "mental health disabilities including but not limited to bipolar disorder." *Id.*

According to Plaintiff, his disabilities caused him to have difficulty "balancing and ambulating." *Id.* Therefore, he required a "cane, walker, wheelchair, grab bars, lowered bed, padding on floor, accessible jail cell, and other ambulation assistance, balancing and steadying devi[c]es and other medical assistance and a handicap accessibility." *Id.*

Plaintiff claimed that he suffered "multiple falls" as a result of his severe medical conditions and Defendants' "failure to provide urgently needed, proper, reasonable and necessary medical care, reasonable accommodations, correct medication, correct durable medical equipment, medical evaluation, referral to medical specialists and testing, and also due to other wrongdoing of defendants." *Id.* at 3. Plaintiff alleged that Defendants "acted with malice against Plaintiff and discriminated against plaintiff based on his physical and mental disabilities." *Id.* As a result, Plaintiff claims he suffered serious and permanent injuries. *Id.*

## II.    STANDARD

Summary judgment is appropriate if the moving party shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The material facts must be viewed in the light most favorable to the nonmoving party *only if* there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. at 248-49.

The initial burden is on the moving party to show the absence of a genuine dispute of material fact. *See Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (the burden on the moving party is one that involves "identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits demonstrating the absence of a genuine issue of a material fact."). While the moving party bears the initial burden, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The Supreme Court has emphasized that:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to

the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Scott*, 550 U.S. at 380 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted)).

The nonmoving party must point to record evidence to establish a genuine issue of fact. *Harvey v. City of Philadelphia*, 253 F. Supp. 2d 827, 831 (E.D. Pa. 2003) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.1993). "Without any specific supportive facts in the record, the plaintiff's bald assertions alone cannot overcome the defendants' motion for summary judgment." *Id*. at 831.

Summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Marten v. Gordon*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex*, 477 U.S. at 322-23).

## III.    DISCUSSION

Plaintiff separated his Amended Complaint into three counts:

COUNT ONE
(ADA and Rehabilitation Act Against City of Philadelphia);

COUNT TWO
(Section 1983 and Intentional Infliction of Emotional Distress Against City of Philadelphia); and,

## COUNT THREE
(Negligence/Medical Malpractice and § 1983 Against Corizon and MHM).

*See* ECF No. 15.

First, there is no claim against the City for IIED.[3]  Second, although

Plaintiff did not allege a specific count for IIED against Corizon and MHM, both

argued in favor of summary judgment in their respective motions and Plaintiff

responded.[4]  Therefore, the Court will consider it here.

The Court will address Plaintiff's claims against the individual Defendants

first and conclude with Plaintiff's § 1983 claim against all Defendants.

### A. ADA and RA claims against the City

The City does not dispute that the ADA applies to them or that Plaintiff is

entitled to the Act's protections.  The City argues that "Plaintiff was provided with

all reasonable accommodations and constant access to medical attention and

Plaintiff has not identified a single accommodation that was denied to him." ECF

No. 49 at 8.  Moreover, the City contends that the record provides "nothing to

suggest that Plaintiff was ever denied reasonable accommodations or assistance or

---

[3] Plaintiff addresses his response to "ALL DEFENDANTS," *see* ECF No. 52 at 8; however, the Court previously dismissed Plaintiff's IIED claim against the City by Order dated May 29, 2018, *see* ECF No. 12, and, again, by Order dated November 26, 2018, *see* ECF No. 31.
[4] *See* ECF No. 15 at 17 (Said conduct by Defendants Corizon and MHM was outrageous and intolerable in a civilized society, giving rise to a claim for Intentional Infliction of Emotional Distress).

was ever discriminated against, let alone **on the basis of** his disability." *Id*. at 9

(emphasis in original).

The RA provides, in pertinent part:

> No otherwise qualified individual with a disability…shall, solely by reason
> of his or her disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any program or activity
> receiving Federal financial assistance or under any program or activity
> conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). The RA "expressly makes the standards set forth [in the ADA]

applicable to federal employers and to employers receiving federal funding."

*Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

The ADA provides, in relevant part:

> Subject to the provisions of this title, no qualified individual with a disability
> shall, by reason of such disability, be excluded from participation in or be
> denied the benefits of the services, programs, or activities of a public entity,
> or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Accordingly, the same standards apply to both RA and ADA

claims. *See* 29 U.S.C. § 794(d); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 208

(3d Cir. 2009).

Title II of the ADA prohibits public entities from denying services or

otherwise discriminating against individuals on the basis of disability. 42 U.S.C.

§ 12132. Likewise, Title III prohibits places of public accommodation from

discriminating against individuals or denying them "goods, services, facilities,

privileges, advantages, or accommodations" on such basis. § 12182(a).

In order to present a successful claim under the ADA or the RA, a plaintiff must prove (1) he is a qualified individual, (2) he has a disability, (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by such entity; and (4) that such denial or discrimination was by reason of his disability. *Bowers v. NCAA*, 475 F.3d 524, 553 n. 32 (3d Cir. 2007).

In his response, Plaintiff maintains that

> [he] has proven claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and § 504 of the Rehabilitation Act of 1973, based on the prison's failure to provide reasonable accommodations for [his] disability and failure to give equal access as required by Title II and § 504. [He] through testimony and medical records has proven these averments.

ECF No. 52 at 3. Plaintiff does not cite the "testimony and medical records" he claims supports his position. According to Plaintiff, "[t]he proofs make clear that Plaintiff is alleging discrimination and intentional discrimination by Defendant City of Philadelphia for not providing him with needed ambulatory assistive devises [sic], grab-bars." ECF No. 52 at 4.

As stated in the Court's previous Order, *see* ECF No. 12, these allegations are insufficient to state a claim under the ADA. First, providing inadequate medical care, even if related to a disability and even if such conduct amounts to negligence, is not actionable discrimination under the ADA. *See Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006) (citing *Bryant v. Madigan*, 84 F.3d 246, 249

(7th Cir. 1996)). "The ADA prohibits disability-based discrimination, not inadequate treatment for the disability." *Kokinda v. Pennsylvania Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016).

The City does not argue that Plaintiff is not a qualified individual with a disability. Instead, even if Plaintiff satisfied the first two elements, the record leaves no dispute that Plaintiff received regular medical attention and services, especially when he requested it. Plaintiff does not dispute that when he arrived to CFCF there is no record of him informing anyone of his "back issues," pain or mobility issues, and he did not ask for any accommodations. Plaintiff does not dispute that when he requested a cane, he received one the same day. Plaintiff does not dispute that he was provided a lower bunk bed. Accordingly, without evidence in the record that the City excluded Plaintiff from participation in or denied him the benefits of its services, programs, or activities, or other discrimination, Plaintiff cannot satisfy the third element of his claim.

Furthermore, Plaintiff cannot recall the dates of his falls. The first documented evidence of his fall was January 20, 2016, which was fifteen days after he was given a cane. After Plaintiff complained that his cane did not offer enough to accommodate his poor balance, the City provided him a wheelchair. Plaintiff does not dispute that he had his wheelchair at the time he suffered his March 26, 2016 fall. Plaintiff does not dispute that he was never denied access to

sick call slips or prevented from filing sick call slips. Plaintiff does not dispute that he was denied treatment. Accordingly, the record demonstrates that when Plaintiff asked, the City provided Plaintiff with all reasonable accommodations and medical access, and Plaintiff has failed to identify with record evidence an accommodation that was denied to him.

Even if Plaintiff could point to record evidence that places the third element in dispute, Plaintiff failed to provide any evidence whatsoever to satisfy the fourth element that such denial or discrimination was "by reason of his disability." Therefore, without record support that Plaintiff was excluded from participation in or denied the benefits of the City's services, programs, or activities, or otherwise discriminated against, summary judgment must be entered in favor of the City.

## B. Medical Malpractice against Corizon and MHM

Corizon argues, "[Plaintiff] has not sued any individual physicians or medical providers [and he] has not produced expert who has opined what the standard of care was or that any of the defendants violated the standard of care. ECF No. 48 at 25. As such, Plaintiff has failed to present a *prima facie* case of medical malpractice. *Id*. at 26.

In response, Plaintiff argues,

As outlined in Plaintiff's Exhibit 1 [Verified Statement] and Defense Exhibit C (Plaintiff's deposition), plaintiff made many complaints and requests for medical assistance in the weeks (uincouding [sic] for infection and severe back and neck pain) leading up to his falls and condition aggravation and

3/26/16 hospitalization, coma and emergency spinal surgery; defendants' medical staff saw plaintiff and merely sent him back to his cell with an OTC pain medication at most. They did not believe him and failed to give him any real examination or treatment. Corizon was also aware of his complaints of bladder infection, which they did not examine or treat, leading to his septic shock and coma.

ECF No. 52 at 5-6. Again, Plaintiff submits his testimony (i.e., verified statement "Exhibit 1" and deposition "Exhibit C") as support, without citation.

MHM argues, "[d]espite the clear deadlines set by the Court, and despite being granted an extension of time [] to do so, Plaintiff has not identified a single expert to opine that MHM Services, Inc., or any of its agents, violated the standard of care or engaged in negligence of any kind. ECF No. 47 at 11. As such, Plaintiff has failed to present a *prima facie* case for medical malpractice. *Id*. at 12.

In response, Plaintiff plainly argues, without citation, "MHM kept changing plaintiff's psychotropic medications, causing him to be less clear in his mind, leading to falls. MHM was also aware of his complaints of bladder infection, which they did not examine or treat, leading to his septic shock and coma." ECF No. 52 at 6. Plaintiff does not support his argument with record evidence.

In his Amended Complaint, Plaintiff averred,

The care, skill or knowledge exercised by Defendants Corizon and MHM in the medical treatment and care of plaintiff at CFCF from January through March 2016 fell outside acceptable professional standards and deviated from the accepted standard of care and was proximate cause in bringing about the aforementioned harm to plaintiff.

ECF No. 15 at 17.

22

1. <u>Plaintiff Failed to Timely File Certificates of Merit</u>

First, under Pennsylvania law, a plaintiff making a claim "based upon an allegation that a licensed professional deviated from an acceptable professional standard" must file a certificate of merit within sixty (60) days of filing the complaint. Pa. R. Civ. P. 1042.3(a). The certificate must state that a licensed professional has given a written statement that the claim is potentially meritorious. Pa. R. Civ. P. 1042.3(a)(1). Although codified as a rule of procedure, the requirement is substantive and so applies in federal court. *Booker v. United States*, 366 F. App'x 425, 426 (3d Cir. 2010).

Failure to timely file a certificate of merit ordinarily warrants dismissal of the plaintiff's medical malpractice claim. *Womer v. Hilliker*, 908 A.2d 269, 275-76 (Pa. 2006). In rare circumstances, however, a plaintiff who makes a "procedural misstep" in failing to timely file a certificate of merit may seek to have his failure excused if he "substantial[ly] compl[ied]" with the Rule's requirements. *Id.* (citing Pa R. Civ. P. 126 "The court… may disregard any error or defect of procedure which does not affect the substantial rights of the parties."); *Booker*, 366 F. App'x at 428-29.

Under those narrow circumstances, in order to have his failure excused, a plaintiff must show more than just a lack of prejudice to the opposing party: he must show that he had a "reasonable explanation or legitimate excuse" for missing

the Rule's strict deadline. *Stroud v. Abington Mem'l Hosp.*, 546 F. Supp. 2d 238, 252-53 (E.D. Pa. 2008).

Plaintiff filed his Complaint in state court on May 24, 2017. The sixty-day deadline passed on July 23, 2017. Plaintiff filed his three certificates of merit on August 2, 2017, a little more than a week late. Plaintiff does not explain the delay, but merely asserts, incorrectly, that his certificates were timely filed.

Plaintiff's discovery effort has not revealed a reasonable explanation or legitimate excuse for the delay and Plaintiff has not offered one.

        2.  <u>Plaintiff Failed to Establish a *Prima Facie* case for Medical Malpractice</u>

Even if Plaintiff had timely submitted his certificates of merit, at this stage, Plaintiff's testimony is not enough to establish a *prima facie* case for medical malpractice and defeat Defendants' motions for summary judgment.

In a medical malpractice action, a plaintiff must call on a qualified expert to offer testimony to establish both the standard of care and the deviation from that standard of care caused Plaintiff's injury. *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003).

Here, Plaintiff failed to support his medical malpractice claim with an expert opinion. Plaintiff submitted reports from his treating physicians Dr. Bonner and Dr. Singer. *See* ECF No. 47-8. However, neither doctor's report addresses the

standard of care itself, let alone any purported deviation therefrom. Plaintiff's

failure is to do so is fatal to his medical malpractice claim.

Notwithstanding, Plaintiff claims "Corizon's medical negligence regarding

the back and neck problems is obvious enough that no expert opinion on standard

of care is needed[.]" ECF No. 54 at 4. According to Plaintiff, "Corizon's and

MHM's negligence is obvious requiring no expert for their failure to address his

bladder infection," *Id*. at 5. The Court flatly disagrees. Without an expert opinion

on Corizon's treatment, such as the adequacy of its examinations, or MHM's

handling or mis-handling of Plaintiff's medications, no reasonable jury could find

that either Defendant engaged in negligence or violated the standards of care when

they treated Plaintiff.[5] Therefore, Plaintiff has failed to establish a *prima facie* case

for medical malpractice against Corizon and MHM, and the Court grants summary

judgment in their favor on those counts.

### C. IIED against Corizon and MHM

To make out a claim for IIED a plaintiff must show: (1) the defendant's

conduct was extreme and outrageous, (2) the defendant acted intentionally or

recklessly, (3) the conduct caused emotional distress, and (4) the distress was

---

[5] Attached to Plaintiff's Response is a report from Dr. Robert B. Sklaroff, M.D., F.A.C.P., *see* ECF No. 52-4. Because Plaintiff produced this report for the first time in his response to the Defendants' Motions for Summary Judgment, the Court did not consider it. *See Astrazeneca AB v. Mut. Pharm. Co.*, 278 F. Supp. 2d 491, 510 (E.D. Pa. 2003), aff'd sub nom. *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co.*, 384 F.3d 1333 (Fed. Cir. 2004).

severe. *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd*, 720 A.2d 745 (Pa. 1998) (citing Restatement (Second) of Torts § 46 (1979)). Plaintiff must also suffer physical harm. *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122-1123 (Pa. Super. Ct. 2004)

Conduct must be "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Reeves*, 866 A.2d at 1122 (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)). While the ultimate determination as to whether conduct is extreme and outrageous is an issue of fact, a court should first decide, as a matter of law, whether the conduct alleged is capable of meeting the standard. *L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp. 3d 918, 927-28 (M.D. Pa. 2015).

Corizon argues, "[Plaintiff] established no outrageous conduct by Corizon or its employees [and he] has taken no depositions or conducted any Discovery on emotional distress." ECF No. 48 at 13.

MHM similarly argues, "[t]here is no conduct in the evidentiary record amounting to extreme, outrageous or atrocious behavior on the part of MHM Services, Inc., or any other individual for that matter." ECF No. 47 at 16.

In response, Plaintiff argues, "the facts as stated with evidence support a state law claim for Intentional Infliction of Emotional Distress." ECF No. 52 at 9.

Again, Plaintiff provides no record support for his position. As such, Plaintiff has created no evidentiary issue for the trier-of-fact to decide.

Here, the record of Defendants' actions, and course of actions, when treating Plaintiff, leaves no room to dispute that their conduct went beyond all possible bounds of decency so as to be regarded as atrocious. The record demonstrates that Defendants provided extensive medical care to Plaintiff that addressed both his physical and mental health needs. The record does not support Plaintiff's allegations that Defendants intentionally refused him medical care or that any such care was ever intentionally withheld. While Plaintiff may disagree with treatment he received, that by itself is not capable of meeting the standard for conduct that a jury could find is outrageous or extreme. Therefore, the Court grants summary judgment in favor of Corizon and MHM on Plaintiff's IIED claims.

### D. § 1983 claims against All Defendants

Section 1983 is a vehicle for imposing civil liability on any person who, acting under the color of state law, subjects any person to the deprivation of any right, privilege, or immunity secured by the Constitution and the laws of the United States of America. 42 U.S.C. § 1983.

The City argues, Plaintiff's § 1983 claim must fail as a matter of law because there is no evidence to support that Plaintiff suffered an underlying

Constitutional violation, let alone his failure to establish a City policy, practice or custom that was the moving force behind such violation. ECF No. 49 at 10.

Corizon argues, "[Plaintiff] was given the opportunity to take discovery and took no depositions to establish a policy or custom concerning his allegations that Corizon refused or inappropriately treated him because of his medical condition." ECF No. 48 at 8.

MHM argues,

[t]here is no evidence in the record showing that any policy or custom enacted by MHM Services, Inc., or MHM Correctional Services, Inc., amounted to deliberate indifference to Plaintiff's needs. Further, Plaintiff has failed to produce any evidence that any MHM official with final policy making authority acted with deliberate indifference. In fact, there has been no evidence related to the policies, procedures or customs in place at CFCF in 2016 produced, or even requested, in this case.

ECF No. 47 at 13.

Effectively, all Defendants maintain that Plaintiff has failed to adduce evidence of an underlying Constitutional violation and/or a policy, practice or custom that was the moving force behind a violation.

In response, Plaintiff argues,

a policy or custom [] exist[s] where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

ECF No. 52 at 7. Plaintiff contends, therefore, "[he] has proven a claim under §

1983." *Id*. Plaintiff submits his testimony to support his claim that Defendants

engaged in "outrageous neglect despite serious medical issues." *Id*. at 7-8. Plaintiff

argues that "the neglect continued [for] months without the administration [or the

'higher-ups at the Philadelphia prison system'] stepping in [provides] constructive

evidence [that] the administration knew or should have known and did nothing,

thus providing evidence of an unwritten policy or custom, meeting the

requirements of Monell." *Id*. Again, Plaintiff submits his response without citing

record evidence and he applies the same argument to all three Defendants under

the subtitle, "SECTION 1983 CLAIMS (ALL DEFENDANTS)." *Id*. at 6.

A municipality or other corporate entity may be held liable for its

employees' violation of a person's civil rights under § 1983, but not on a theory of

*respondeat superior*. *Monell v. Dept't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978).

To make out a claim against such an entity, a plaintiff must establish that: (1) the

entity had a policy or custom that deprived him of his civil rights; (2) the entity

acted deliberately and was the moving force behind the deprivation; and (3) his

injuries were caused by the identified policy[6] or custom.[7] *Id*. at 692-94.

---

[6] A "[p]olicy is made when a 'decision maker possess[ing] final authority to establish . . . policy
with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of
Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475
U.S. 469, 481 (1986)).

[7] "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but
that is 'so widespread as to have the force of law.'" *Natale v. Camden Cty. Corr. Facility*, 318

"[A] plaintiff must plead a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Henry v. City of Erie*, 728 F.3d 275, 280 (3d Cir. 2013) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir.2008)). Therefore, in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

Here, in his response to Defendants' motions, Plaintiff does not point to a specific Constitutional violation. Previously, in his Amended Complaint, Plaintiff averred that the City's

> prison guards' refusal to provide assistance to plaintiff inside his cell, refusal to provide an accessible cell and modifications to make the cell accessible, and refusal to transport plaintiff to the infirmary for requested medical treatment, and refusal to provide plaintiff with a needed walker and wheelchair: these refusals by [the City's] prison guards were done as part of a widespread practice and pervasive custom carried out between 2010 and 2016. This policy, which violates the ADA and Rehabilitation Act, gives rise to a § 1983 claim.

ECF No. 15 at 14. Plaintiff claimed that

> [t]here is evidence and information demonstrating that the above refusals, by [the City's] guards to provide requested reasonable accommodations to plaintiff as a qualified disabled inmate, were part of an ongoing practice and pervasive custom of [the City]: there were a multitude of complaints written up and otherwise lodged by disabled inmates of the Philadelphia Prison

---

F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of the Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 417 (1997)).

System from 2010 to 2016, complaining of the same types of discrimination plaintiff has averred herein; despite the many complaints, the practice continued and the complaints continued. This policy, which violates the ADA and Rehabilitation Act, gives rise to a § 1983 claim.

*Id*. According to Plaintiff, "[t]hese policies violate the 8th and 14th Amendments to the Constitution by constituting cruel and unusual punishment and deprivation of substantive due process and equal protection of the laws, by treating the disabled differently from those similarly situated." *Id*.

According to the Supreme Court, "[i]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997) (citing *Graham,* 490 U.S. at 394).

At this stage, however, Plaintiff does not argue the violations he alleged in his Amended Complaint, let alone analyze it under the appropriate standard. Plaintiff's response includes phrases such as "deliberately indifferent" and "outrageous neglect despite serious medical issues," which clearly suggests an Eighth Amendment violation. The City begins its analysis of Plaintiff's claim under the Fourteenth Amendment and Plaintiff offers no response. The City also addresses a violation of equal protection and Plaintiff does not respond. The City and Corizon analyze Plaintiff's claim under the standard for an Eighth Amendment violation and Plaintiff does not respond.

While this Court is not required to comb the record in order to make arguments for Plaintiff, even a cursory review of the record alongside Plaintiff's response directed to all Defendants, and lending all inferences in a light most favorable to Plaintiff, the underlying Constitutional right at issue here is the Eighth Amendment for deliberate indifference to an inmate's serious medical needs.

The Eighth Amendment proscribes punishments that "involve the unnecessary and wanton infliction of pain." *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "Deliberate indifference to a prisoner's serious medical needs constitutes an unnecessary and wanton infliction of pain." *Id*. (citing *Estelle*, 429 U.S. at 104). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. Plaintiff must show: (1) that defendants were deliberately indifferent to his medical needs and (2) that those needs were serious. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Here, the only issue is whether Defendants were "deliberately indifferent" to Plaintiff's needs.

Deliberate indifference "requires obduracy and wantonness ... which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Id*. (citation and quotation omitted).

"It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197; *see Estelle*, 429 U.S. at 105–06. Additionally, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Ascenzi v. Diaz*, 247 Fed.Appx. 390, 391 (3d Cir. 2007) (quoting *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

The Third Circuit has "found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citations omitted). Here, the evidence does not support either scenario.

The record in this case reveals no genuine dispute that Plaintiff received extensive medical attention for his mental and physical health needs. The records from Plaintiff's treatment show that he received frequent care for his mental health. Mental health providers adjusted Plaintiff's medications based on his complaints and presentation, and those same providers referred Plaintiff to medical when confronted with questions regarding any physical health symptoms.

Plaintiff received medical attention from multiple psychiatrists, nurses, doctors, and physician assistants, often on the same day. He had multiple labs drawn, x-rays taken, and an education on overall health strategies, such as coping mechanisms for adjusting to life in prison. As MHM aptly points out, Plaintiff received medical attention between January 1, 2016 through March 1, 2016 on the following dates: January 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 15, 17, 19, 20, 21, 22, and 29; February 8, 9, 10, 11, 20, 22, 23, 24, 25, 26, and 29; March 4, 5, 9, 11, 12, 14, 22, 24, 25, and 26.

Plaintiff's initial allegations did not materialize into facts. Corizon correctly submits that Plaintiff's "blanket allegations found in the Amended Complaint were sufficient to defeat a motion to dismiss but not a motion for summary judgment." Plaintiff is required to show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Here, there is simply no record evidence that any member of Defendants' medical staff displayed behavior that amounts to conscious disregard for a serious risk or an intentional refusal to provide care.

Plaintiff does not cite any record evidence that shows any one of the three Defendants deliberately refused to provide him treatment, deliberately delayed treatment for a non-medical reason, prevented him from receiving necessary or recommended treatment, or deliberately persisted in a particular course of

treatment "in the face of resultant pain and risk of permanent injury." *Rouse*, 182 F.3d at 197 (quoting *White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990)).

Plaintiff may disagree with his treatment or adequacy of the treatment he received while incarcerated at CFCF. However, his disagreement is not enough to raise an inference of deliberate indifference. Without any evidence lending itself in favor of the variety of instances where the Third Circuit has found deliberate indifference, Plaintiff cannot satisfy the standard for establishing a violation under the Eight Amendment.

Lastly, even if Plaintiff established an underlying Constitutional violation, whether it is under the Eighth or Fourteenth Amendment, Plaintiff cannot establish municipal liability against either Defendant under *Monell* because the record is devoid of any facts supporting the existence of a municipal policy, practice or custom. Plaintiff's blanket allegation that the "higher-ups at the Philadelphia prison system" by way of its "unwritten policy or custom" condoned the "widespread and pervasive custom of outrageous medical neglect to inmates despite serious medical issues," finds no record support. Plaintiff's allegation that a "pattern and practice" exists for denying medical care to inmates with disabilities does not give rise to a plausible inference of discrimination on its own, as it is unsupported by any specific examples of similar conduct that would suggest such a pattern or practice. Moreover, Plaintiff failed to identify a final policymaker.

There is no record evidence as to who, if anyone, was a final policy maker with final decision-making authority.

Accordingly, after a lengthy discovery period, Plaintiff compiled no record evidence that can advance a § 1983 claim against any one of the three Defendants. Plaintiff does not support his response with specific factual allegations. Plaintiff does not specifically identify an underlying Constitutional violation. Plaintiff does not identify an official policy and the record evidence does not describe separate incidents which could plausibly suggest an unofficial custom.

## E. CONCLUSION

For the foregoing reasons, without any specific supportive facts in the record, Plaintiff's testimony alone cannot overcome the Defendants' Motions for Summary Judgment. Accordingly, the Court grants summary judgment in favor of Defendants on all counts alleged in Plaintiff's Amended Complaint.

**BY THE COURT:**

/s/ Chad F. Kenney

**Date:** March 31, 2020

_____

**CHAD F. KENNEY, JUDGE**